IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | ) | |
|---|---|---|
| RASHAD SWANIGAN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 4780 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Rashad Swanigan sued a number of Chicago police officers and their employer, the City of Chicago, for violations of his civil rights as the result of an incident where he was held for an extended period of time after being arrested. (*See* N.D. Ill. Case No. 07 C 4749) ("2007 Suit"). That case went to trial against two subsets of those officers, and the jury awarded Swanigan damages on his unlawful detention claim. A year after he filed that case, Swanigan filed the instant case against the City, asserting that the City itself was liable for the violations of Swanigan's rights under *Monell v. City of New York Department of Social Services*, 436 U.S. 658 (1978) because a municipal policy or practice caused the violations ("*Monell* Suit"). As is common practice in this District, the Court stayed this *Monell* Suit in favor of proceeding with the 2007 Suit because the City agreed, consistent with its usual practice (and Illinois law), to indemnify the officers. Swanigan now moves to lift that stay and proceed on his *Monell* claim challenging two allegedly unconstitutional practices by the Chicago Police Department (CPD): the "hold past court call" procedure and the "cleared-closed" procedure. As detailed below the Court denies Swanigan's motion and dismisses the case

because there is no actual case or controversy as to either procedure and, in addition, Swanigan has not stated a claim for which relief can be granted as to the "clear-closed" procedure.

## I. PROCEDURAL AND FACTUAL HISTORY

### A. 2007 Suit

In August 2007, Swanigan filed suit under 42 U.S.C. § 1983 against almost two dozen Chicago police officers as well as the City, alleging that he was falsely arrested and unlawfully detained in August 2006. The Court recounted the facts of the case in full in its lengthy opinion on the parties' summary judgment motions (*see Swanigan v. Trotter*, 645 F. Supp. 2d 656 (N.D. Ill. 2009)); the following facts will relevant for the purposes of this motion.

On August 22, 2006, two CPD patrol officers, spotted Swanigan leaving a bank on Chicago's north side. The officers had received information at their morning roll call regarding the "Hard Hat Bandit," who allegedly had robbed a number of banks on the City's north side wearing a yellow hard hat. The officers ran the plates on Swanigan's car, and the system indicated that they were suspended due to an insurance problem. When they approached, the officers saw Swanigan "hotwiring" the car. Though Swanigan protested that he, in fact, had insurance, he did not produce an insurance card and the officers arrested him. The officers then searched Swanigan's car and found a knife as well as a yellow hard hat. Believing that Swanigan could be the Hard Hat Bandit, a more senior officer approved Swanigan's arrest for traffic violations and told the arresting officers to contact the detectives investigating the bank robberies. The detectives then started investigating Swanigan for a different crime, namely the recent robbery of a Popeye's Chicken restaurant, not the traffic violations for which he was actually arrested.

2

In order to round up witnesses for various lineups for the Popeye's Chicken robbery, the detectives put a "hold" on Swanigan, meaning he would not be released from custody, or go to court, without the "hold" being released. Without the "hold," Swanigan could have been released the same day he was arrested. However, as a result of the "hold," he was held for two additional days (under conditions he found uncomfortable) while he was placed in various lineups. Several witnesses identified Swanigan as the Popeye's Chicken robber. On the evening of August 26, 2006, Swanigan's hold ended and he was released after a state prosecutor declined to charge Swanigan with the Popeye's Chicken robbery. All told, he spent 51.5 hours in custody, the vast majority after his fingerprints had cleared the CPD's database. Approximately two weeks later, a CPD sergeant reviewed the reports generated by the detectives with respect to Swanigan and marked the file "Cleared - closed other exceptional." The sergeant picked that designation because the CPD closed its investigation after prosecutors refused to approve charges. That sergeant testified that the detective's report identified Swanigan as the offender in the Popeye's Chicken robbery and that employees of the restaurant had picked Swanigan out of lineups. (*See* Case No. 07 C 4749, Doc. 168-21.)

In August 2011, the case went to trial before this Court on Swanigan's false arrest claim (as to the three arresting officers) and his unlawful detention claim (as to eight officers involved in his detention). The jury found for the arresting officers on Swanigan's false arrest claim, but awarded him $60,000 in damages on his unlawful detention claim, finding seven of the eight officers liable. The jury did not award any punitive damages.

3

**B.     *Monell* Suit and the Stay**

In August 2008, a year after he filed the 2007 Suit, Swanigan filed the *Monell* Suit challenging a pair of allegedly unconstitutional practices by the CPD, the "hold past court call" procedure and the "clear-closed" procedure. Specifically, Swanigan alleged in his complaint that the "hold" procedure allows the police to arrest individuals without a warrant on minor crimes and then hold them for unreasonable periods of time while officers drum up more evidence of different, unrelated crimes. In his motion to lift the stay, Swanigan clarifies that the "hold" procedure is unconstitutional because it unreasonably delays an independent finding of probable cause by a neutral magistrate.[1] Though the thrust of Swanigan's *Monell* complaint (and his motion to lift the stay) is against the "hold" procedure, he also takes issue with the CPD's "cleared-closed" procedure, where by a criminal investigation is "cleared"—meaning "solved," according to Swanigan— indicating an arrestee or suspect was the perpetrator, even if that person is not charged with the crime. In other words, the procedure "permits the closing of official police department records with innocent suspects identified as actual career offenders." (Doc. 17 at 1.) In his motion to lift the stay, Swanigan adds that he is still erroneously identified in police records as the perpetrator in the Popeye's Chicken robbery, even though that crime was perpetrated by the Hard Hat Bandit, who Swanigan concedes was caught and imprisoned several years ago. (*Id*. at 2.)

In December 2008, the City moved to consolidate the *Monell* Suit (then pending before another court) with the 2007 Suit because they arose from the exact same facts. The Court granted that motion, and the City stipulated in the 2007 Suit that it would indemnify the officers for

---

[1]The *Monell* complaint also takes issue with how the CPD conducts and documents its lineups, but Swanigan's motion to lift the stay does not mention that issue and states that an amended complaint would narrow the issues in the *Monell* case.

compensatory damages and attorneys' fees awarded under 42 U.S.C. § 1988, and accept one dollar in nominal damages against it if any compensatory damage award was entered against one of the individual officers.[2] The Court then stayed the *Monell* Suit, as is common in this District, because if a jury found against the officers, the City would pay in any event and Swanigan would not have to demonstrate a municipal policy or practice (or engage in the extensive discovery *Monell* cases typically require) to recover directly from the City. *See, e.g., Medina v. City of Chicago*, 100 F. Supp. 2d 893, 895 (N.D. Ill. 2000) (listing the advantages of staying discovery in *Monell* claims until after the claims against the individuals are complete).

Consistent with the stipulation, the City offered, with its briefing on the instant motion to lift the stay, a proposed certification of entry of judgment against it in both the 2007 Suit and the *Monell* Suit. That certification states that the City "agrees to entry of judgment against the City for compensatory damages" and that the City "waives its right under *Monell* . . . not to be held liable in damages under section 1983 without proof that the City by its 'policy, custom or practice,' and with the requisite degree of culpability, caused the alleged constitutional violation." (*See* Doc. 21-1 at 2.) The City also reiterated its "irrevocable" commitment to indemnify the individual officers, and set out that the City "agrees to pay nominal damages (not to exceed one dollar), as plaintiff has proven a violation of a substantive constitutional right and actual compensable injury." (*Id.*)

---

[2]Though Illinois law requires municipalities to indemnify their employees for tort judgments incurred while acting within the scope of their employment (*see* 745 Ill. Comp. Stat. 10/9-102), and courts have noted that the City's collective bargaining agreement with its police officers requires the same (*see Parker v. Banner*, 479 F. Supp. 2d 827 829 (N.D. Ill. 2007)), such stipulations are not academic, because they protect the plaintiff against changes in the law and policy and prevent the City from refusing to indemnify an officer post-judgment by asserting the officer was acting outside the scope of his employment.

## II. DISCUSSION

### A. "Hold Past Court Call" Procedure

"It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1980). Swanigan asserts that in addition to damages "nominal or otherwise," he will amend his complaint to seek "declaratory and/or injunctive relief." As an initial matter, Swanigan has no right to further compensatory damages against the City in the instant *Monell* suit. *Monell* provides a way for a plaintiff to seek compensation for violations of constitutional rights directly from a municipality; it does not provide an avenue for extra compensation above what a plaintiff receives from an individual municipal employee. *See Monell*, 436 U.S. at 691; *see also Almaraz v. Haleas*, 602 F. Supp. 2d 920, 926 (N.D. Ill. 2008) (noting "*Monell* would only be an alternative means of holding the City liable for the [constitutional violation] and would not increase or decrease the damages–nominal or compensatory–that plaintiff is entitled to receive for his injuries."). In other words, a jury determined that the proper compensation for Swanigan's extended detention is $60,000. He has recovered that amount of money from the officers (and ultimately, the City). Because he cannot recover twice for the same injury, there are no more compensatory damages available to him from the City in the *Monell* Suit. As for punitive damages, the City is immune. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) (punitive damages are not available against municipalities under § 1983). Finally, turning to nominal damages, the City agreed in its stipulation that it would accept judgment for nominal damages in the amount of one dollar if a jury awarded compensatory damages against one of its officers. The certification, in turn, accepts

judgment for those nominal damages. In short, Swanigan has received in the 2007 Suit all the possible monetary damages he could receive in the *Monell* Suit.

That leaves the "declaratory and/or injunctive relief." With respect to the declaratory relief, the certification already provides a statement by the City that his constitutional rights were violated. It is true that in its proposed certification, the City does not admit that a municipal policy caused the violation of his rights, or that the City's alleged "hold" policy is unconstitutional. However, to the extent that Swanigan wants to litigate the *Monell* Suit in search of a such a verdict or declaration that the City's practice is unconstitutional (for deterrence value or his own satisfaction), there is no case or controversy. *See Alliance to End Repression v. City of Chicago*, 820 F.2d 873, 878 (7th Cir. 1987) ("[P]recedent, valuable though it is, must be a by-product of the resolution of a real controversy. A party does not 'prevail' by obtaining a precedent divorced from any other results."); *Parker v. Banner*, 479 F. Supp. 2d 827, 833 (N.D. Ill. 2007) (citing *Alliance to End Repression* and explaining "[i]n simple terms, if you just want a trial court to say that the City was wrong, you have not presented a case or controversy to that court . . . you cannot sue for the court's opinion since the expression of judicial views is a by-product of the need to decide the case.") (internal quotation omitted); *Almarez*, 602 F. Supp. 2d at 925 (finding it "inappropriate" to permit a plaintiff to proceed on a *Monell* claim "based on its possible deterrent value when all the actual relief he can be entitled to receive has already been determined"); *see also Petersen v. Gibson*, 372 F.3d 862, 866 (7th Cir. 2004) (noting "[t]he mere moral satisfaction of being wronged" was insufficient to be a "prevailing party" for purposes of an award of attorneys' fees under § 1988).

Swanigan also cannot seek an injunction against the "hold" procedure. To allege an actual controversy, Swanigan must

> demonstrate a personal state in the outcome to assure that concrete adverseness which sharpens the presentations of issues necessary for the proper resolution of constitutional questions. Abstract injury is not enough. [Swanigan] must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury of threat of injury must be both real and immediate, not conjectural or hypothetical.

*Lyons*, 461 U.S. at 101-102. In *Lyons*, the plaintiff sought an injunction against the Los Angeles police department's policy of using chokeholds during arrests even if the suspect was not resisting arrest or threatening the officers. *Id.* at 98. The Supreme Court, applying the principles set down in *O'Shea v. Littleton*, 414 U.S. 488 (1974), found that the plaintiff's "standing to seek the injunction requested depended on whether he was likely to suffer future injury form the use of the chokeholds by police officers." *Id.* at 104-05. "That [the plaintiff] may have been illegally choked," the Court concluded, "while presumably affording [the plaintiff] standing against individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation." *Id.* at 105. The Court then detailed what the plaintiff would need to allege to establish an actual controversy, namely (1) that he would likely have another encounter with the police as well as (2) the "incredible assertion" that all the city's police officers always choke any citizen they encounter or that the City ordered or authorized the officers to choke citizens in such situations. *Id.*

The Court noted that while the complaint alleged the municipality authorized the chokeholds, the plaintiff had not sufficiently alleged that he would have another encounter with the police. *Id.*; *see also Gates v. Towery*, 430 F.3d 429, 432 (7th Cir. 2005) (finding prospective relief "inappropriate" where the plaintiff did not contend that he was likely to be arrested again). Even

8

if the "odds" were that the plaintiff would be stopped again, it was "untenable to assert . . . that strangleholds are applied by the . . . police to every citizen who is stopped or arrested regardless of the conduct of the person stopped." *Lyons*, 461 U.S. at 108. It was "conjecture" to assume that the police would choke everyone, and "speculation" that the plaintiff would, himself, be arrested again, and, if arrested, be choked. *Id.* Finally, the Court also found that the plaintiff could not seek an injunction via the standing he had in his damages case; he could not show an irreparable injury given there was no real or immediate threat he would be stopped and choked again, and in any event, he had an adequate remedy at law. *Id.* at 111; *see also Campbell v. Miller*, 373 F.3d 834, 836 (7th Cir. 2004) ("Unless the same events are likely to happen again to him, there is no controversy between him and the City about the City's future handling of other arrests.").[3]

In *Littleton*, the plaintiffs claimed that they were subject to discriminatory application of the criminal laws, namely, that black people seeking equality (and their white supporters) were sentenced more harshly than other defendants, and sought an injunction against the county officials' racially discriminatory practices. 418 U.S. at 490-91. The Court found no actual case or controversy, because although past wrongs were evidence bearing on "whether there is a real and immediate threat of repeated injury," the prospect of future injury rested "on the likelihood that [the plaintiffs] will again be arrested for and charged with violations of the criminal law and will again be subjected to bond proceedings, trial, or sentencing before [the defendants]." *Id.* at 497-98. The Court assumed "that [the plaintiffs] will conduct their activities within the law and so avoid

---

[3]In *Lyons*, the Supreme Court also ruled that the plaintiff did not have standing under the "capable of repetition, yet evading review" doctrine, given that the plaintiff could litigate his constitutional claim for the illegal chokehold for damages. 461 U.S. at 109-110.

9

prosecution and conviction as well as exposure to the challenged course of conduct." *Id.* at 498.

This case is a straightforward application of *Lyons* and *Littleton*. In his *Monell* complaint, Swanigan has not plead that he is likely to be arrested again, and his motion to lift the stay provides no basis to suspect he would be. The Court will assume, as the Supreme Court did in *Littleton*, that Swanigan will follow the law and not encounter the "hold" procedure. Further, like the plaintiff in *Lyons*, Swanigan does not plead or suggest any basis to believe that even if he was arrested again, he would be subject to the "hold" procedure again. Indeed, crediting Swanigan's allegations in his *Monell* complaint, it appears that the "hold" procedure is only used by the police if they suspect the person arrested on a minor offense was involved in a more serious crime. Under *Lyons* and *Littleton*, Swanigan cannot seek injunctive relief against the "hold" procedure.

B.    **"Cleared Closed" Procedure**

In his motion to lift the stay, Swanigan details his complaint as to the "cleared-closed" procedure.[4] Specifically, a CPD "Case Supplementary Report," drafted by a detective, lists Swanigan as the "offender" in the August 17, 2006 Popeye's Chicken robbery, states he was picked out of lineups by witnesses to the robbery[5], and contains a narrative tying him to the Hard Hat Bandit's bank robberies. According to Swanigan (referencing testimony in the 2007 Suit), the case was then marked "cleared-closed" when the prosecutor declined to charge Swanigan with the Popeye's Chicken robbery. Swanigan asserts that he "does not know under what circumstances and

---

[4] For expediency, the Court will consider the assertions in Swanigan's motion to lift the stay as if they were included in Swanigan's *Monell* complaint.

[5] Swanigan's motion to stay suggests that the CPD report erroneously states that Swanigan was picked out of lineups by witnesses to the Popeye's Chicken robbery. However, at summary judgment and trial in the 2007 Suit, it was undisputed that Swanigan was picked out of at least some lineups. *See Swanigan*, 645 F. Supp. 2d at 670.

to whom the police records identifying him as a violent offender might be made available." (Doc. 22 at 4.) Swanigan seeks "expungment" relief as to the police report and injunctive relief with respect to the "cleared closed" procedure.[6] As an initial matter, Swanigan cannot seek injunctive relief with respect to the "cleared closed" procedure for the same reasons that he cannot seek an injunction against the "hold" procedure. Just as he has not pled (and likely could not plead) any facts supporting the conclusion that he is likely to be arrested again, Swanigan has not plead any facts suggesting that he would be listed on another police report as an offender, in spite of his innocence, and have that case considered closed without those charges filed.

That leaves "expungement" relief. Swanigan's proposed *Monell* claim for expungment of the police report has at least two fatal flaws. First, Swanigan does not state a claim under § 1983. *See Wilson v. Price*, 624 F.3d 389, 392 (7th Cir. 2010) (requiring a violation of federal constitutional rights to support a § 1983 suit). Swanigan does not cite any cases that find an individual's rights are violated when that individual is discussed as a suspect in a crime in a detective's report, accompanied by a summary of the evidence against the suspect, even if the suspect is innocent of the crime. Nor does Swanigan cite any authority that holds that an individual's rights are violated when the police close a case when a prosecutor refuses charges and the police records reflect that the individual was the main suspect (or listed in the "offender" box). Police investigations, including a detective's thoughts with respect to the involvement of ultimately innocent parties, should be documented fully, and innocent people are, unfortunately (but necessarily), investigated for crimes all the time. It is a matter of common sense that the police keep track of who they believe committed the crime and list the evidence against that person. Even if the case is eventually

---

[6]The specifics of what such injunctive relief against the "clear-closed" procedure would be is unclear.

"cleared-closed" because the prosecutor thinks the evidence is insufficient, perhaps the police will happen across additional evidence in the future that allows them to charge the original suspect. Such basic and sensible police record-keeping does not violate Swanigan's constitutional rights. Moreover, crediting Swanigan's assertion that he did not rob the Popeye's Chicken restaurant for current purposes, it is undisputed that he was briefly a suspect in that crime, was picked out of lineups by witnesses, and the State's Attorney declined to charge him. By seeking expungement of the record that states (truthfully) that he was a suspect and the lineup evidence against him (which existed, even if it was insufficient to support charges), Swanigan is really asking the Court to be the Ministry of Truth in George Orwell's *1984* and re-write the history of the investigation in a way that suggests Swanigan was never investigated. Put another way, there is no constitutional right not to be investigated for a crime and an individual's constitutional rights are not violated when a police detective documents that investigation with his thoughts and opinions. Even accepting Swanigan's assertions as true, he has not stated a violation of his constitutional rights.

Second, Swanigan does not have standing to seek the expungement relief in the first place. To have standing under Article III's "case or controversy" requirement, Swanigan must plead, among other things, that his claimed injury is "both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Parvati Corp. v. City of Oak Forest*, 630 F.3d 512, 516 (7th Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Swanigan must also "demonstrate standing separately for each form of relief sought." *Parvati*, 630 F.3d at 516 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 185 (2000)). In simple terms, Swanigan has not asserted any actual injury resulting from his name appearing on the single internal detective report; any injury is purely hypothetical. Swanigan's hypothetical and contingent

injury contrasts with the concrete injury in *Monroe v. Thigpen*, 932 F.2d 1437 (11th Cir. 1991), one of the cases cited by Swanigan, where inaccurate information that a prisoner was a sex offender hampered the prisoner's chances for parole. The internal detective's report is not an official finding or as far as the Court can tell, even part of Swanigan's criminal record. Rather, Swanigan's assertions indicate it is part of the investigative file of the Popeye's Chicken robbery. As noted above, Swanigan concedes in his briefing that he is unaware of how the report might be distributed or what injury it may cause him.

At bottom, Swanigan is really questioning whether the CPD should consider a case to be "cleared" or "solved" even if the alleged perpetrator is not charged with a crime. (*See* Compl., Doc. 1, at ¶ 7 ("The procedure further allows the [CPD] to close cases where the violent offender has never been charged, prosecuted or otherwise taken off the streets of the City of Chicago.").) In other words, Swanigan suggests that the CPD should not consider a case closed until the alleged perpetrator is actually prosecuted, or that the CPD should not close a case until the actual criminal is found. However, whether the police should considered a case to be "cleared" that is not actually "solved" is an issue of police procedure and allocation of police resources to be determined by the Chicago City Council and CPD commanders; it is not a constitutional question for this Court to decide because neither Swanigan nor any other citizen of Chicago has a constitutional right to police protection or to have any particular crime investigated or charged. *See Town of Castle Rock v. Gonzales,* 545 U.S. 748, 768 (2005) (individual has no due process right to enforcement of a restraining order); *DeShaney v. Winnebago Cty. Dep't of Soc. Servs*., 489 U.S. 189, 195 (1989) (the Due Process Clause is "phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security."). In short, if Swanigan disagrees with the "cleared-

closed" procedure because it lets the real criminal get away with the crime, he should seek a legislative solution, not a judicial one.

## III. CONCLUSION

For the foregoing reasons, Swanigan's motion to lift the stay is denied and the case dismissed for lack of an actual case or controversy (with respect to the "hold" procedure) and for failure to state a claim and lack of an actual case or controversy (with respect to the "cleared closed" procedure).

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: January 4, 2012